[798 NYS2d 30]

THE SEGAL COMPANY, Respondent-Appellant, v CERTAIN UNDER-
WRITERS AT LLOYD'S, LONDON, Appellants-Respondents.

First Department, June 30, 2005

### APPEARANCES OF COUNSEL

*Mendes & Mount, LLP*, New York City (*George L. Maniatis, Mary Ann D'Amato* and *Alex K. Ross* of counsel), for appellants-respondents.

*Dickstein Shapiro Morin & Oshinsky LLP*, New York City (*Randy Paar* and *John P. Winsbro* of counsel), for respondent-appellant.

### OPINION OF THE COURT

ELLERIN, J.

The issue before us is whether public policy requires that an insured under a claims-made liability insurance policy be offered a right to purchase extended reporting period coverage upon the termination of coverage under the policy.

Plaintiff is an employee benefits consulting firm that has been insured by defendants since 1997. Defendants are individuals or corporations who are members of syndicates that conduct business at Lloyd's in London, which syndicates "subscribe" in proportionate shares to insurance policies.

Defendants sold plaintiff a primary professional liability insurance policy and an excess professional liability insurance policy for the period April 15, 2000 to April 15, 2003. Both were "claims-made" policies, as to which the primary policy contains the following notice:

> "This is a Claims made form. Except to such extent as may otherwise be provided herein, the coverage afforded under this insurance policy is limited to liability for only those Claims that are first made against the Insured and reported to the Underwriters while the insurance is in force. The limit of liability available to pay Damages shall be reduced and may be completely exhausted by payment of Claims Expenses. Damages and Claims Expenses shall be applied against the deductible. Please review the coverage afforded under this insurance

policy carefully and discuss the coverage hereunder with your insurance agent or broker." The excess policy contains a similar notice.

Pursuant to these policies, defendants agreed

"To pay on behalf of the Insured Damages and Claim Expenses which the Insured shall become legally obligated to pay because of any Claim or Claims, first made against the Insured, . . . and reported to the Underwriters during the Period of Insurance or Extended Reporting Period, arising out of any act, error or omission of the Insured in rendering or failing to render Professional Services."

The extended reporting period referred to in the paragraph quoted above is defined in the policies as

"the selected period of time purchased in accordance with Clause X after the end of the Period of Insurance for reporting Claims, suits or proceedings arising out of acts, errors or omissions which take place prior to the end of the Period of Insurance and otherwise covered by this insurance."

Clause X provides that

"[i]n the event of cancellation or non-renewal of this insurance by Underwriters, the Named Insured shall then have the right, in consideration of the appropriate additional premium, to an extension of the cover granted by this policy to apply . . . in respect of any Claim made against any Insured during the period selected below after the expiration date of this policy but only when such Claim arises out of acts, errors or omissions committed prior to the expiration date of this policy."

Clause X further provides that "[t]he quotation by Underwriters of a different premium or deductible or limits of liability or changes in policy language for the purpose of renewal shall not constitute a refusal to renew by the Underwriters."

By letter dated March 25, 2003, defendants transmitted "2003 Renewal Terms" for plaintiff's insurance. Because of plaintiff's adverse loss history, which included paid claims of more than $21 million between 1999 and 2001, as compared to $1.52 million in premiums paid by plaintiff for the same period, the renewal terms included higher deductibles and higher premiums.

The expiring primary policy provided $5,000,000 in coverage, subject to an annual aggregate of $5,000,000 and a $250,000 deductible for each claim; the renewed policy would provide $5,000,000 in coverage, subject to an annual aggregate of $5,000,000 and a $7,500,000 deductible (or "retention") per claim. Plaintiff paid three annual premiums of $218,500 for the expiring policy and would pay a premium of $3,250,000 for the renewed policy. The expiring excess policy provided an additional $5,000,000 in coverage, for which plaintiff paid three annual premiums of $80,000; the renewed policy would provide the same additional coverage, for which plaintiff would pay a premium of $2,000,000.

Plaintiff regarded the above terms as a refusal on defendants' part to renew the policies, and advised defendants that it intended to purchase extended reporting period (ERP) coverage for the policies. Defendants declined to sell plaintiff ERP coverage, on the ground, as provided in clause X of the policy cited above, that such coverage is only available in the event of defendants' cancellation or nonrenewal of the insurance, and that the quotation of different limits, deduction, premium and alternative terms and conditions does not constitute a nonrenewal.

Plaintiff then brought this action, seeking a declaration that the 2003 renewal terms do not constitute a renewal of the policies and that plaintiff is entitled to purchase ERP coverage in accordance with the terms of those policies, and asserting that defendants breached the terms of the policies by refusing to sell plaintiff such coverage. Plaintiff then moved for summary judgment declaring that defendants refused to renew the policies and ordering them to sell plaintiff ERP coverage in accordance with the policies' terms.

The motion court denied plaintiff's request for a declaration that the 2003 renewal terms were not an offer to renew the policies, but, as a matter of public policy, ordered defendants to sell plaintiff ERP coverage. In light of clause X, we conclude that the court correctly determined that there was no contractual triggering of plaintiff's right to purchase ERP coverage under its policies. However, the court erred in holding categorically that public policy favors the automatic triggering of a right to purchase ERP coverage upon the termination of policies.

New York State's general disapproval of claims-made policies, such as plaintiff's, is expressly set forth in Insurance Department Regulation 121 (11 NYCRR part 73; *see Curiale v Ardra*

*Ins. Co.*, 88 NY2d 268, 276 [1996] ["The regulation of the insurance industry is closely related to the public interest and a legitimate exercise of a State's police powers"]). In contrast to the traditional "occurrence" policy, which generally provides liability coverage for injury or damage that occurs within the policy period, without regard to when the claim is made or suit is filed, the "claims-made" policy generally provides coverage only when a claim is made during the policy period (11 NYCRR 73.0 [a]). The Insurance Department promulgated Regulation 121 as a consequence of its finding that "claims-made coverage tends to provide less protection than occurrence coverage, [and] that claims-made coverage compared to occurrence coverage is a more complicated and confusing method of coverage that can create potential coverage gaps" (§ 73.0 [c]).

To counter this consequence, Regulation 121, with certain exceptions, prohibits the provision of claims-made coverage in any policy issued or renewed in this state (11 NYCRR 73.2), and imposes certain minimum standards on those claims-made policies that are permitted and on the issuing insurers (11 NYCRR 73.3). Among the minimum standards with which a claims-made liability insurance policy and the issuing insurer must comply is that ERP coverage must be available upon termination of coverage under the policy (§ 73.3 [c] [1]).

However, because the policies issued by defendants in the instant case fall within an exception to Regulation 121, they are not subject to these minimum standards. Policies procured from unauthorized insurers by licensed excess line brokers are exempt from the provisions of Regulation 121 (11 NYCRR 27.10 [a]; *see Matter of John Paterno, Inc. v Curiale*, 88 NY2d 328, 332 n [1996]). Defendants are foreign Lloyd's underwriters and as such are not "licensed to do an insurance business in this state" (Insurance Law § 6116 [c]). While as a general rule New York State Insurance Law prohibits the sale in New York of insurance underwritten by insurers not authorized to conduct business in New York (Insurance Law § 2117 [a]; 11 NYCRR 27.0 [a]), it permits excess line brokers to procure insurance from unauthorized insurers (*see* Insurance Law § 2105 [a]; § 2117 [h]), if they have been unable "after diligent effort" to procure the full amount of required insurance from authorized insurers (Insurance Law § 2118 [b] [3] [A]).

The instant policies were written in the excess and surplus lines market through Aon Risk Services, Inc. of New York, plaintiff's surplus lines broker. Accordingly, they are not subject

to the provisions of Regulation 121 (11 NYCRR 27.10 [a]). We therefore hold that the motion court erred in finding that New York public policy as expressed in Regulation 121, a regulation that is not applicable to defendants, requires them to sell ERP coverage to plaintiff.

The instant policies also fall within another exception to the requirement of 11 NYCRR 73.3 (c) (1) that extended reporting period coverage be available upon termination of coverage. Section 73.3 (c) (3) provides that "[f]or policies issued or renewed pursuant to section 73.2 (d) (1) of this Part, extended reported period coverage *need not be offered* upon termination of coverage pursuant to section 73.1 (n) (2) of this Part" (emphasis added). Section 73.1 (n) (2) defines termination of coverage as "decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the insured."

Policies issued pursuant to section 73.2 (d) (1) are policies that meet any of the following criteria: (i) they insure a large commercial insured (as defined in section 73.1 [g]); (ii) they provide primary coverage of at least $5,000,000 per occurrence; (iii) they provide excess coverage of at least $1,000,000 per occurrence; or (iv) they are written with a deductible of at least $100,000 per occurrence. "Large commercial insured" is defined as an insured that meets any of five standards of net worth, assets and revenue, one of which is that it is a for-profit business entity that has gross assets exceeding $25,000,000 and generates annual gross revenues exceeding $25,000,000 (§ 73.1 [g] [4]).

Plaintiff's policies meet all four criteria of section 73.2 (d) (1). Plaintiff is a "large commercial insured" as measured by its total estimated revenues of $181,921,000 and total gross assets of $100,000,000 in 2002 (cl [i]), and the policies provide for primary coverage of $5,000,000 for each claim (cl [ii]) and for excess coverage of $5,000,000 (cl [iii]), and are written with a $250,000 deductible for each claim (cl [iv]). Accordingly, pursuant to section 73.3 (c) (3), ERP coverage was not required to be offered for plaintiff's policies upon termination of coverage.

Thus, even if defendants were subject to the provisions of Regulation 121, they would not be required to offer ERP coverage to plaintiff upon the termination of its policies because section 73.3 (c) (3) excepts policies such as plaintiff's from that requirement. Indeed, Regulation 121 makes clear that it is not New York State policy to give every insured the protection of

the automatic right to purchase ERP coverage upon the termination of its policies.

The cross appeal by plaintiff should be dismissed as taken by a party not aggrieved (CPLR 5511; *see Parochial Bus Sys. v Board of Educ. of City of N.Y.*, 60 NY2d 539, 544 [1983]).

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered January 7, 2004, which granted plaintiff's motion for summary judgment on public policy grounds and directed defendants to sell to plaintiff extended reporting period coverage for its primary and excess insurance policies, should be reversed, on the law, without costs, and the motion denied. The cross appeal by plaintiff should be dismissed, without costs.

ANDRIAS, J.P., SAXE, SULLIVAN and SWEENY, JJ., concur.

Order, Supreme Court, New York County, entered January 7, 2004, reversed, on the law, plaintiff's motion for summary judgment denied and the cross appeal dismissed, without costs.